INHABITANTS OF PALMYRA *vs.* WAVERLY WOOLEN COMPANY.

Somerset.    Opinion December 18, 1906.

*Waters and Water Courses.    Freshets.    Dam.    Lost Bridge.    Injuries.*
*Liability.    Evidence.*

This is an action originally brought for the recovery of damages for the loss of a bridge erected and maintained by the plaintiffs across Sebasticook River in the town of Palmyra, alleged to have been destroyed by reason of a dam built by the defendant across the river, below the bridge. By amendment it was converted into an action for the recovery of the money expended in erecting a new bridge to take the place of the one carried away. After the plaintiffs had presented all their evidence, the presiding Justice ordered a nonsuit, to which the plaintiffs excepted.

The case has once been before the Law Court and is reported in 99 Maine, 134. In the first trial the plaintiffs recovered a verdict and upon motion by the defendant the court set the verdict aside. The ground upon which the court proceeded in concluding to set the verdict aside was that the freshet which carried the bridge away was very unusual although not unprecedented. In the opinion in that case the court said : " In the freshet in 1901, the water of the river rose suddenly and so high that at the bridge it reached the bottom of the structure, and the cakes of ice floating down struck the bridge and threw it down into the river. There was no evidence that the defendant company did not exercise all due diligence to give the freshet free vent through the gates and waste ways of the dam. The only complaint was that the dam was too high."  . . . .  "The bridge was not injured by the highest water of any freshet for a decade. The freshet, in which it was carried away by the ice brought down by the current, was a very extraordinary one, caused by unusually heavy rains at the season of melting snows. This was to human ken a fortuitous and very infrequent combination of powerful natural causes, unusual and unexpected. The resulting loss must, therefore, remain where it fell."

*Held :* that the court is unable to discover in the testimony in the second trial any new evidence which sufficiently changes the aspect of the case with reference to the duty of the defendant or the severity of the freshet which carried away the bridge, so as to warrant the court in sustaining the exceptions to the ruling of the presiding Justice ordering a nonsuit.

See *Same* v. *Same*, 99 Maine, 134.

On exceptions by plaintiffs and by defendant. Plaintiffs' exceptions overruled. Defendant's exceptions not considered.

Action on the case originally brought for the recovery of damages for the loss of a bridge erected and maintained by the plaintiffs across the Sebasticook River in the town of Palmyra, alleged to have been destroyed by reason of a dam built by the defendant across said river, below the bridge. By amendment the action was converted into an action for the recovery of money expended by the plaintiffs in erecting a new bridge to take the place of the one carried away. To the allowance of said amendment the defendant took exceptions but the same were not considered by the Law Court. At the conclusion of the plaintiffs' evidence, in the second trial, the presiding Justice ordered a nonsuit and thereupon the plaintiffs took exceptions.

This case has once been before the Law Court and the same is reported in 99 Maine, 134.

The case appears in the opinion.

*Forrest Goodwin,* for plaintiffs.

*Moore & Anderson and Manson & Coolidge,* for defendant.

SITTING : WISWELL, C. J., EMERY, WHITEHOUSE, SAVAGE, PEABODY, SPEAR, JJ.

SPEAR, J. This is an action originally brought for the recovery of damages for the loss of a bridge erected and maintained by the plaintiffs across Sebasticook River in the town of Palmyra, alleged to have been destroyed by reason of a dam built by the defendant across the river, below the bridge. By amendment it was converted into an action for the recovery of the money expended in erecting a new bridge to take the place of the one carried away. After the plaintiffs had presented all their evidence, the presiding Justice ordered a nonsuit, to which the plaintiffs excepted. To the allowance of the amendment the defendant also excepted. Therefore the case comes up on exceptions by both parties. As the plaintiffs' exceptions are decisive of the case, we need not consider those of the defendant.

The case has once been before the Law Court and is reported in 99 Maine, 134. In the first trial the plaintiffs recovered a verdict

and upon motion by the defendant the court set the verdict aside. The ground upon which the court proceeded in concluding to set the verdict aside was that the freshet which carried the bridge away was very unusual although not unprecedented. The court say : "In the freshet in 1901, the water of the river rose suddenly and so high that at the bridge it reached the bottom of the structure, and the cakes of ice floating down struck the bridge and threw it down into the river. There was no evidence that the defendant company did not exercise all due diligence to give the freshet free vent through the gates and waste ways of the dam. The only complaint was that the dam was too high." Again they say upon this same point : "The bridge was not injured by the highest water of any freshet for a decade. The freshet, in which it was carried away by the ice brought down by the current, was a very extraordinary one, caused by unusually heavy rains at the season of melting snows. This was to human ken a fortuitous and very infrequent combination of powerful natural causes, unusual and unexpected. The resulting loss must, therefore, remain where it fell."

If this was a correct basis for setting the first verdict aside, we are unable to discover in the testimony in the second trial any new evidence which sufficiently changes the aspect of the case with reference to duty of the defendant or the severity of the freshet which carried away the bridge, to warrant us in sustaining the exceptions to the ruling of the Justice ordering a nonsuit.

The plaintiffs, however, claim that they have produced such new and material evidence, both upon the frequency and degree of the freshets occurring upon this river previous to 1901, that the question of fact whether the defendant should not have been held to anticipate the occurrence of just such a freshet as took away the bridge and to have provided measures to prevent it, should have been submitted to the jury.

Practically all the new evidence that bears upon these points is obtained from witnesses who lived many miles below the locus of the bridge, at a point where the witnesses themselves admit the status of recurring freshets may be influenced by conditions that do not obtain at all at the locus in question. Most of these witnesses

live in the vicinity of Winslow and Benton and have observed the freshets at these points below the dam at Benton Falls and upon the course of the Sebasticook River almost at its junction with the Kennebec. These witnesses admit that the height of the freshets at Winslow and vicinity may be to a greater or less degree controlled by the condition of the water in Kennebec River. Consequently it appears that the height of the freshet in April, 1901, upon the Sebasticook near the Kennebec cannot be safely taken as a criterion from which to determine the nature of the freshet existing at Palmyra.

It may be said, however, that the testimony of the witnesses from the vicinity of Winslow shows that the freshet at this point was one which, if not unusual and unexpected, so excited the interest of the town officers that they initiated preparations for the protection and safeguarding of their property upon the river. The testimony of these witnesses, or one of them at least, also establishes the fact that above Benton Falls at one time an ice gorge existed occasioning a rise of water so high as to overflow the electric road and intervales. This class of evidence, if submitted to the jury, should not have the effect in the mind of the court, if it did in that of the jury, of overcoming the testimony of numerous witnesses who lived in the vicinity of, and many in close proximity to, the bridge that was carried away, the exact point of inquiry, whose evidence certainly tends to show that the freshet at this point, taken in connection with the floating mass of ice was under the rule of law already laid down in 99 Maine, unprecedented, and of such a character that the defendant should not be legally held to have anticipated its occurrence.

It is not our purpose to review all this testimony. It is from the plaintiffs' own witnesses, and we think a fair conclusion from the summary of all of it brings the decision of this case within the rule above stated. The defendant is certainly entitled to have its rights tested upon inferences drawn from the plaintiffs' witnesses, who had the best opportunity to know and the intelligence to comprehend the situation and conditions surrounding the negligence with which it is charged.

We have read the testimony of all the witnesses and we find that

Thomas F. French is a good representative of this class. He was a resident of Palmyra and lived about fifty rods west of the bridge at the time of the freshet. His testimony satisfies us that the freshet of April 10, 1901, was the highest since 1887. While he testifies that he has seen the water run over the road at the ends of the bridge two or three times, yet he says it would not come within a foot or fifteen inches of the bridge. In answer to direct questions, he says: Q. The highest water you ever saw at the bridge was when? A. In 1901. Q. April? A. April, yes sir. With respect to the height of the water in April, 1901, this witness testified: Q. And did the water come up to the bridge? A. It did. He also said it remained there for a period of three or four days. He further testifies that the water alone did not take the bridge away, and would not have done so if it had flowed over the bridge at a height of five feet, but that a large field of ice, formed in a cove like the one he and others were trying to fasten to prevent it from escaping and striking the bridge, was raised and carried by an extraordinary height of water and the course of the winds, into the channel and down the river to the destruction of the bridge; also that this river is a warm stream, that the ice melts away and the flowage of ice is uncommon.

J. F. Rand, of the town of Palmyra, another witness who had opportunity to know, says that in this freshet of 1901, the water was the highest he ever knew and that it was the "biggest freshet" he had ever seen. While other witnesses testify to the existence of very high water at several times between 1887 and 1901, we are unable to discover that the testimony of any one of them when fairly analyzed and compared with the monuments by which they seek to determine the height of the water is in serious conflict with that of the two witnesses above quoted. They speak of the water running over the road at the ends of the bridge, but as before suggested, when the height of the water over the road to which they testified is compared with the height of the bridge, it will be seen that at these times the water was considerably below the bottom of the bridge, while at this time it was almost up to it, within an inch or two of it. Under certain conditions a six inch rise of water may

change an ordinary freshet to an extraordinary and damaging one. In the case at bar we are inclined to think that this was the case. Mr. French, in speaking of the ice in this river says, "There never any ice comes down that river ; it is a warm river, and we never see any ice in it in the spring coming down ; it always thaws before the ice breaks up, there is never any ice any way up in that river for it thaws out and comes down and that is all we see in the river. In speaking of the flowage of the ice this witness says, "We went up upon this piece of ice that came out of the cove. The river was clear but there was a cove up above there, perhaps an acre or two and the wind was to the eastward then, but we went up there to- that piece of ice, and I thought I would stick down poles through it to fasten it, and if we could fasten that cake of ice the bridge would stay where it was ; but the wind swung around into the northwest and took this on the Billy Moore and Mike Dyer place and it moved that out into the river, while we were up on the right of the river fastening this other piece." Q. Was that a large cake of ice? A. It was, yes sir. Q. And thick ? A. It was some twelve or fifteen inches thick, I should think.

No witness in the case testifies to any previous occasion when any menance or injury was threatened to structures upon this river from fields of floating ice. We think that the combination of the elements which produced this floating mass of ice should relieve the defendant from the charge of negligence in not anticipating and providing against it. While they should be held as a matter of common knowledge to anticipate and forestall the ordinary or even the unusual flow of ice in the ordinary or even unusual freshets, yet we do not think the rule of law governing this class of cases required them to anticipate the unprecedented raising and loosening of a great square of ice and its passage down the river in one solid mass.

The case falls fairly within the principles laid down in China v. Southwick et al., 12 Maine, 238. The two cases are somewhat similar. In both cases the dam was legally erected and maintained and not calculated to cause any damage to the plaintiffs' bridge at the usual and ordinary stages of the water throughout the year including the usual recurring and to be expected freshets at the different seasons,

as they occurred in the series of years. In the Southwick case, the loss was occasioned by great rains and by the violence of the wind, and the court say in this case, "If the dam had not raised the water to a certain height the rain and wind superadded might not have done the damage. . . . . . Their connection, however, was fortuitous, and resulted from the extraordinary and unusual state of things." So in the case at bar, while the dam may have contributed to the causes which produced the loss of the bridge, it was not, however, responsible for the combination of wind, water and ice that swept it away.

*Exceptions overruled.*